OPINION
This appeal is taken from the final judgment of the Juvenile Division of the Lake County Court of Common Pleas. Appellant, Kelly A. Evancic, appeals from the juvenile court's judgment terminating her parental rights and granting permanent custody of her minor daughter, Gabrielle Evancic ("Gabrielle") to appellee, Lake County Department of Job and Family Services ("LCDJFS").[1]
The following procedural history is relevant to this appeal. Gabrielle was born on October 18, 1996, and on November 15, 1997, at the age of thirteen months, she was removed from appellant's home. Gabrielle has remained in foster care since the removal and has adjusted well.
On November 20, 1997, a complaint was filed by Cuyahoga County Department of Children and Family Services ("CCDCFS") seeking temporary custody of the child. According to the complaint, Gabrielle was first brought to CCDCFS because appellant had left the child with a neighbor and did not return for at least eight hours or inform the neighbor of her whereabouts. The complaint further alleged that appellant had a drug abuse problem that prevented her from providing proper care for her child and had a history of leaving the child for an extended period of time with appellant's whereabouts being unknown.
On February 12, 1998, Lake County formally accepted jurisdiction over this matter based on appellant's residence in the county. As a result, temporary custody was transferred to LCDJFS, and Robert E. Somogyi was appointed guardian ad litem.
On March 30, 1998, an initial case plan was drafted for appellant, which included the following objectives: (1) complete parenting classes; (2) continue with outpatient drug/alcohol treatment; (3) remain sober; (4) participate in Alcoholics Anonymous ("AA") meetings consistently; (5) submit to random urine screens; and (6) consistently visit with her child.[2]
Beginning in February/March 1998, LCDJFS provided appellant with the opportunity to visit Gabrielle once a week. There was consistency in the visitation up until May 1998. Thereafter, the visits either became irregular or ceased altogether. Then, in November 1998, appellant voluntarily left Ohio to reside in Nevada. Since that time, appellant has remained in Nevada, except to attend permanent custody hearings in Ohio.
On March 11, 1999, LCDJFS filed a motion pursuant to R.C. 2151.413 and 2151.415 seeking permanent custody of Gabrielle. A permanent custody hearing was held on October 8, 1999, wherein LCDJFS presented the following witnesses: (1) Ginny Dilly ("Ms. Dilly"), an outpatient counselor for the Lake/Geauga Center who was involved in making assessments and individual and group therapy; (2) Olga Christou ("Ms. Christou"), a social worker at CCDCFS; (3) Mary Lynn Dixon ("Ms. Dixon"), a social worker at Lake County Department of Human Services ("LCDHS"); (4) Katherine Kasputis ("Ms. Kasputis"), a social worker at Ashtabula County Children Services Board ("ACCSB"); and (5) appellant.[3]
The juvenile court also received a written report from the guardian adlitem on October 8, 1999, which recommended that LCDJFS's motion for permanent custody be granted.
At the close of the October 8, 1999 hearing, the parties, without objection, were ordered to submit closing argument by filing written briefs. Subsequently, on January 11, 2000, appellant filed a motion to reopen the permanency hearing to supplement the record with new evidence.
In response to this request, the juvenile court issued a judgment entry dated January 13, 2000. Therein, the court held its ruling in abeyance so to provide appellant with the opportunity to present evidence regarding her present living conditions and to support her claim that she had been complying with the case plan objectives in Nevada. The court further ordered LCDJFS to contact the appropriate agency in Nevada and request a full and thorough investigation, evaluate appellant's current status, and provide a report to all the parties. Once this was completed, a hearing would be reconvened to consider this new evidence and any additional evidence that the parties may provide.
The permanency hearing was reconvened almost a year later on October 13, 2000, and appellant testified on her own behalf.[4] At the conclusion of this hearing, the juvenile court, again without objection, continued the proceedings so to provide LCDJFS with an opportunity to present rebuttal witnesses. After granting a continuance pursuant to a request of appellant, a final hearing was held on January 11, 2001. At this hearing, LCDJFS presented the testimony of Melanie J. Hale ("Ms. Hale"), a caseworker for the agency in the Children's Services Division. Appellant, again, testified on her own behalf and presented one witness, Loretta Kozak ("Ms. Kozak"), her mother.
After taking this matter under consideration, the juvenile court issued a decision in a judgment entry dated February 1, 2001. Therein, the court found, by clear and convincing evidence, that it was in the best interest of the child to grant permanent custody to LCDJFS as there was a critical need for a legally secure permanent placement for the child. As a result, appellant was divested of all her parental rights.
It is against this judgement granting permanent custody of her daughter to LCDJFS that appellant asserts the following four assignments of error for our consideration:
 "[1.] The Trial Court erred and abused its discretion in its determination to grant permanent custody to the Lake County Department of Human Services (nka Department of Job and Family Services).
 "[2.] Revised Code Section 2151.419 establishes a duty on the part of a children's services agency to make reasonable efforts to reunite parents with their children who have been removed from the home.
 "[3.] The Trial Court has the duty to consider all past, present and future evidence to determine whether to terminate parental rights and grant custody of a minor child to Lake County Department of Family and Job [sic] Services.
 "[4.] The Trial Court erred and abused its discretion when it failed to admit into evidence Mother's Exhibits."
 In her first assignment of error, appellant contends that the juvenile court erred in granting permanent custody to LCDJFS as she had complied with the case plan while residing in Nevada. Essentially, appellant argues that the two-prong test outlined in R.C. 2151.414(B) has not been satisfied.
R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to LCDJFS if the court determines, by clear and convincing evidence, that: (1) it is in the best interest of the child to grant permanent custody to the agency; and (2) the child is not abandoned or orphaned, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents. Accordingly, R.C. 2151.414(B) establishes a two-pronged analysis that the juvenile court must apply when ruling on a motion for permanent custody. In re Ranker (Oct. 6, 2000), Portage App. No. 99-P-0072, unreported, 2000 WL 1488060, at 2; In re Jacobs (Aug. 25, 2000), Geauga App. No. 99-G-2231, unreported, 2000 WL 1227296, at 3; In re Frary (Dec. 17, 1999), Geauga App. No. 98-G-2132, unreported, 1999 WL 1313623, at 4;In re Taylor (June 11, 1999), Ashtabula App. No. 97-A-0046, unreported, 1999 WL 417995, at 2.
As the child in this case was not orphaned or abandoned, the focus of the juvenile court turns to whether the child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. To support a finding that a child cannot be placed within a reasonable time with either of his/her parents, the factors listed under R.C. 2151.414(E) must be considered. In other words, the juvenile court is required to enter such a finding if it determines, by clear and convincing evidence, that one or more of the factors enumerated in R.C. 2151.414(E)(1) through (16) exist with respect to each of the child's parents.
Next, the juvenile court proceeds to an analysis of the child's best interest. In determining the best interest of the child, R.C. 2151.414(D) mandates that the juvenile court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian adlitem, with due regard for the maturity of the child; (3) the custodial history of the child; and (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency.
On appeal, a reviewing court "must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy this burden of proof." In re Adoption of Holcomb (1985), 18 Ohio St.3d 361,368. An appellate court will not overturn the juvenile court's decision to terminate parental rights and award permanent custody to an agency unless the judgment is unsupported by clear and convincing evidence.Holcomb at 368; Ranker at 3; Jacobs at 4; Frary at 4; Taylor at 3.
With these legal principles in mind, we turn to the case at bar and appellant's assertion that the two-prong test established in R.C.2151.414(B) has not been satisfied. In its February 1, 2001 judgment entry granting permanent custody of Gabrielle to LCDJFS, the juvenile court made the two required determinations by clear and convincing evidence. Initially, the juvenile court proceeded under R.C. 2151.414(B) by finding that the child could not be placed with either parent within a reasonable time.[5]
In making this finding, the juvenile court was addressing division (E) of the permanent custody statute. Pursuant to R.C. 2151.414(E), the juvenile court was required to enter such a finding if the court determined, by clear and convincing evidence, that one or more of the conditions enumerated in R.C. 2151.414(E)(1) through (16) existed.
In the present case, although the juvenile court did not make reference to a particular revised code section, it seems that the court relied on R.C. 2151.414(E)(1). R.C. 2151.414(E)(1) provides the following:
 "Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties." (Emphasis added.)
 As to R.C. 2151.414(E)(1), the juvenile court found that, notwithstanding the reasonable case planning and diligent efforts by the agency to assist appellant in remedying the problems that initially caused Gabrielle to be placed outside the home, appellant has failed continuously and repeatedly to substantially remedy the conditions causing the child's removal. The record reflects that as early as March 1998, LCDJFS formulated a case plan in order to reunify appellant with her daughter.
At the time of the permanent custody hearing, appellant did complete parenting classes as required by the case plan. There was, however, substantial evidence tending to show that appellant failed to remedy the conditions causing her daughter's removal.
For instance, while Cuyahoga County had jurisdiction over this matter, a case plan was devised for appellant by CCDCFS. The specific goals of that case plan were for appellant to maintain stable housing, attend counseling, and obtain a drug and alcohol assessment. As the social worker for the Cuyahoga County case, Ms. Christou was assigned to monitor appellant, and she testified that appellant did not maintain stable housing. Although an assessment was obtained, appellant failed to follow through with an aftercare program. Appellant did, however, attend three supervised visits scheduled in December 1997 and January/February 1998.
After this matter was transferred to Lake County in February 1998, Ms. Dixon was the assigned social worker. According to Ms. Dixon, appellant did not successfully complete the case plan goal regarding drug and alcohol treatment. This was supported by the testimony of Ms. Dilly, who verified that appellant came to the Lake/Geauga Center for a drug and alcohol assessment. On numerous occasions, appellant was scheduled to begin a relapse prevention program. She, however, failed to attend such a program. As for the random urine screenings, appellant submitted to such testing in February and March of 1998. Since then, she has not participated in such testing.
While residing in Nevada, appellant was informed in June 1999 that LCDJFS was seeking permanent custody of Gabrielle. It was only then that appellant began attending AA meetings and counseling sessions allegedly with an individual named Marty. In addition, appellant indicated that she completed a drug and alcohol class and three impulse control/anger management sessions. According to appellant: "I completed plenty of treatment programs in my life. I could probably teach one of them."
Appellant further claimed she had been drug free since November 1998. This, however, was contradicted by the fact that appellant admitted to being arrested in November 1999, for driving under the influence in Nevada and later convicted of that offense. When confronted with this by a social worker in Nevada who was conducting a home study pursuant to an interstate compact request by the Ohio Department of Human Services ("ODHS"), appellant testified that she asked the social worker not to advise the Ohio agency of this offense.
While still in Ohio, LCDJFS also offered appellant an opportunity to visit with Gabrielle once a week, beginning in February/March 1998. One of the goals of the case plan was for appellant to maintain regular visits with Gabrielle so to strengthen their bond. There was consistency in the visits up until May 1998. Thereafter, the visits became more sporadic.
For instance, Ms. Dixon testified that appellant visited her daughter only twice in May 1998, and once or twice a month from June until August 1998. In September 1998, appellant failed to make any visits, while in October 1998, there was only one visit. No visits occurred in November 1998. The reason provided by appellant for the sporadic visitation during this time was "because on and off I was going down into the hood inCleveland and I was getting high." (Emphasis added.)
After relocating to Nevada in November 1998, appellant did not visit her daughter until October 7, 1999, the day before the first permanency hearing. At this visit, appellant brought gifts for Gabrielle, and thereafter, sent the child an Easter, birthday and Christmas gift. The next time appellant visited her daughter was over a year later, on October 12, 2000. As before, this visit took place the day before the second permanency hearing. Ms. Hale, who was present during the visit, described Gabrielle as being unresponsive and not interacting with appellant. Instead, the child held onto Ms. Hale during the entire visit.
In summation, from November 1998 until January 2001, appellant visited her daughter a total of two times. Other than sending a gift to the child on occasion, there was no further communication of any kind.
Now we consider appellant's status in Nevada. Either in late October or early November 1998, appellant notified Ms. Dixon that she was leaving for Nevada to get married and intended to return to Ohio in a few days. At the time appellant relocated to Nevada, she described herself as a "woman thinking with a crack soaked brain[.]" Davonne Boykin ("Mr. Boykin") accompanied appellant on this trip. Soon after arriving in Nevada, they were allegedly carjacked, and appellant lost all her possessions.
Then, appellant claimed to have been held hostage by Mr. Boykin from November 1998 until the end of March 1999. During this time, appellant was unable to contact anyone because according to her, Mr. Boykin "made sure there was no telephone in anywhere we were staying." Nevertheless, in February 1999, while appellant was allegedly being held against her will by Mr. Boykin, they both went to the Department of Human Resources, Division of Children and Family Services, in Nevada to inquire into interstate placement. According to appellant, she was finally able to get away from Mr. Boykin in March 1999.
From the time appellant left for Nevada in November 1998 until March 1999, Ms. Dixon was unable to establish contact as appellant would not leave a phone number or address. It was only in April 1999 that appellant's attorney was able to provide Ms. Dixon with an address and phone number for appellant in Nevada. When the agency attempted to mail a certified letter to appellant notifying her of an April 1999 permanent custody hearing date, the letter was returned to the agency.[6]
Thereafter, contact with appellant remained sporadic. Appellant has apparently continued to reside in Nevada since November 1998.
As for appellant's employment situation in Nevada, she claimed she obtained employment as a corporate controller with Las Vegas Backhoe, Inc.[7] While there, appellant supposedly maintained the financial affairs of the business, and earned approximately $30,000 annually. Thereafter, appellant claimed to be the president of her own small accounting firm, earning approximately $90,000 a year. Yet, when asked by a social worker in Nevada and the juvenile court in the instant action whether she could produce W-2's or pay stubs as proof of employment or income, appellant was unable to do so. Furthermore, when asked if she were willing to take a drug test, appellant's response was: "If you guys can pay for it. I'm broke." (Emphasis added.)
In light of the above evidence introduced at the permanent custody hearings, it is manifestly apparent that appellant continuously failed, since November 1997, to remedy the conditions at issue. It is true that appellant made some minimal effort to complete some of the objectives established by the case plan. However, appellant failed to maintain any type of consistent contact or communication with her daughter, and she failed to engage in ongoing drug and alcohol treatment programs. She apparently lied about being drug free since being in Nevada. Over a period of several years, appellant failed to alter the course of the conduct which originally brought about the removal of the child. Hence, the juvenile court's judgment as to the existence of the condition set forth in R.C. 2151.414(E)(1) is supported by clear and convincing evidence.
Because the juvenile court's judgment regarding R.C. 2151.414(E)(1) was supported by clear and convincing evidence, we need not address whether there was evidence to support the existence of the factor listed in R.C.2151.414(E)(4).[8] If we were to examine R.C. 2151.414(E)(4) as a basis for the juvenile court's judgment, there would be clear and convincing evidence to support the conclusion that appellant failed to regularly visit, communicate, or support her daughter when she was able to do so.
As we noted earlier, LCDJFS offered appellant an opportunity to visit with her daughter once a week beginning in February/March 1998. There was consistency in the visits up until May 1998. Thereafter, the visits became either sporadic or altogether ceased. In November 1998, appellant voluntarily relocated to Nevada. Since then, appellant has visited her daughter twice and has not otherwise maintained regular communication with her.
While appellant explains that she was unable to afford transportation to Ohio, she, of her own volition, chose to relocate to Nevada. Moving, by itself, is not grounds for termination of parental rights; but, the voluntary relocation by a parent certainly is not an excuse for a failure to visit or communicate regularly with a child. Appellant also suggests that she was "not able to regularly visit or communicate regularly with her daughter[,]" because at this time, her daughter was between the ages of two and four years old. (Emphasis sic.) However, with the exception of a few gifts, appellant failed to send letters, cards, pictures, etc., to her daughter in order to establish a relationship and remain active in her life.
It is evident that appellant demonstrated a lack of commitment towards her daughter through her irregular visits, the eventual total cessation of visitation except when she was in the area for the permanency hearings, and the failure to communicate consistently with her daughter.
Therefore, the juvenile court correctly adjudged that the child could not be placed with either parent within a reasonable period of time or should not be placed with the parents. Having done so, the juvenile court proceeded to the second prong of the required analysis, to wit: a determination that it was in the best interest of the child to grant permanent custody to LCDJFS. The juvenile court ultimately concluded that it was in the best interest of the child that permanent custody be awarded to LCDJFS.
When determining a child's best interest, R.C. 2151.414(D) requires that the juvenile court consider all relevant factors, including, but not limited to, the following:
 "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child;
 "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
"(3) The custodial history of the child;
 "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency."
 Here, the juvenile court's judgment entry reveals that the court considered, in detail, all the enumerated factors in R.C. 2151.414(D). Regarding the interaction of Gabrielle with her foster parents, testimony was presented that she has been in a foster home since she was placed into the custody of LCDJFS in February 1998. The testimony was that Gabrielle has adjusted quite well while in the care of her foster parents, and she is developing normally.
As for Gabrielle's relationship with her mother, the child was not responsive and did not interact with appellant at their last visit. Even when appellant resided in Ohio, she seemingly had a lack of interest in maintaining any communication or an ongoing relationship with her daughter. After voluntarily relocating to Nevada, communication and visits became virtually nonexistent. From November 1998 until January 11, 2001, appellant visited her daughter a total of two times.
Insofar as the wishes of the child are concerned, Gabrielle was not sufficiently mature to express her desire. However, her guardian adlitem determined that Gabrielle's best interest would be served by a grant of permanent custody to the agency for the purpose of adoption so that the child may be provided with a permanent, secure and stable home with a family that is physically and emotionally committed to her.
As to Gabrielle's custodial history, the juvenile court recognized that she has been in the custody of LCDJFS for the majority of her young life. Since then, she had been with foster parents, and is doing well.
Regarding Gabrielle's need for a legally secure permanent placement, there is sufficient evidence that appellant could not offer a secure and permanent home for her daughter. The court noted that the child had a "critical need" for such placement:
 "[T]o delay such custody would be contrary to the expressed intent of the Ohio State legislature that children not continue to languish but that they be provided some degree of permanency at the earliest time possible. This matter has been delayed for a considerable time and no further benefit can be obtained by additional postponement."
 Upon review, we conclude that there was clear and convincing evidence underlying the juvenile court's determination that it was in the best interest of the child that permanent custody be granted to LCDJFS. Accordingly, appellant's first assignment of error is without merit.
In the second assignment of error, appellant further challenges the grant of permanent custody to LCDJFS on grounds that the agency failed to exercise reasonable efforts and due diligence to reunify her with Gabrielle. According to appellant, although she requested her daughter's case to be transferred to Nevada through the Interstate Compact Placement of Children, LCDJFS failed to investigate this option.[9]
When a juvenile court relies on R.C. 2151.414(E)(1) to terminate parental rights, the appropriate inquiry is whether the agency engaged in "reasonable case planning and diligent efforts" to remedy the problems that initially caused the child to be placed outside the home. In the instant matter, there is evidence in the record to support the conclusion that LCDJFS did exercise reasonable case planning and diligent efforts to assist appellant in being reunited with her daughter.
For instance, LCDJFS provided weekly visitation and developed a case plan which emphasized to appellant the importance of completing it in order to achieve reunification. Only after the juvenile court granted the motion for permanent custody did LCDJFS amend the case by changing the goal to adoption.
LCDJFS also attempted to locate relatives that could have cared for Gabrielle. Appellant was able to provide Ms. Dixon with the name of three half-sisters. However, Ms. Dixon's efforts to establish contact with these individuals was futile as appellant was unable to provide accurate addresses.
As to the request for the interstate compact, the juvenile court ordered LCDJFS to contact the appropriate agency in Nevada and request a full investigation and evaluation of appellant's current status.[10] In accordance with the court's order, a home study was conducted on appellant by a caseworker in Nevada. However, upon objection by appellant, the juvenile court excluded these documents at the January 11, 2001 hearing.[11]
In light of the foregoing, we determine that LCDJFS made diligent efforts to reunify appellant with her daughter. Contrary to appellant's assertion, the agency initiated interstate contact with Nevada. For these reasons, appellant's second assignment of error is, therefore, without merit.
In the third assignment of error, appellant contends that the juvenile court abused its discretion when it denied her December 5, 2000 motion for a continuance of the permanency hearing initially scheduled for December 18, 2000.[12] According to appellant, she had requested a continuance to allow her the opportunity to secure attendance of out-of-state witnesses that would corroborate that she had been complying with the case plan. Contrary to appellant's position at oral arguments with respect to this assignment, on appeal she only challenged the juvenile court's failure to grant the continuance rather than the request for payment of costs to transport the witnesses. Thus, we will limit our analysis accordingly.
The grant or denial of a motion to continue a hearing is a matter which is entrusted to the broad discretion of the trial court. Hartt v. Munobe
(1993), 67 Ohio St.3d 3, 9. As such, an appellate court will not reverse the denial of a continuance unless there has been an abuse of discretion. Id. An abuse of discretion connotes more than a mere error in law or judgment; it implies an arbitrary, unreasonable or unconscionable attitude on the part of the trial court. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219.
In the instant matter, the juvenile court did not abuse its discretion because at the time the motion for continuance was made, appellant had already presented her case during the October 13, 2000 hearing. The stated purpose of the upcoming January 11, 2001 hearing was for LCDJFS to present rebuttal witnesses and for the parties to submit closing arguments.[13] No request for a continuance was made during or proximate to the October 13, 2000 hearing. Accordingly, appellant's third assignment of error is meritless.
In appellant's fourth and final assignment of error, she suggests that the juvenile court erred when it excluded certain exhibits as these documents should have been admitted pursuant to Evid.R. 803(6).
To recap, at the October 8, 1999 hearing, appellant attempted to admit into evidence the following exhibits: (1) drug test results from the American Toxicology Institute ("ATI") and an article by the ATI (appellant's exhibit A); (2) a notarized letter written by Carl Ray Cann stating that he was driving appellant to and from AA meetings (appellant's exhibit C); (3) a notarized letter from Bertil Turner and Dorothy Singleton of the Nevada Department of Human Resources, Division of Children and Family Services (appellant's exhibit D); and (4) record from Legal Rehabilitation Services stating that appellant had completed the short-term alcohol and drug program and also attended short-term impulse control/anger management program (appellant's exhibit F).
At the October 13, 2000 hearing, appellant, again, sought to introduce drug test results performed at ATI (appellant's exhibit FF1, 2, 3). Then, at the January 11, 2001 hearing, appellant attempted to introduce the following evidentiary material: (1) a notarized statement from Amorette Strickland stating that she was employed by ATI, and that she was the custodian of the attached toxicology records (appellant's exhibit UU); (2) a notarized letter from Wayne Colla stating that he, as the landlord, was renting property to appellant and that she was a model tenant (appellant's exhibit VV); (3) a notarized letter from Greg A. Stoutimore stating that he had assisted appellant when she opened AA Millennium Corporation and was her roommate for a period of time (appellant's exhibit WW); (4) a notarized letter from Carole A. Gordon stating that appellant was a tenant and was "a very conscientious person who work[ed] hard to make her business a reputable [sic] and profitable one * * *" (appellant's exhibit XX); and (5) a notarized letter from Deryl Adams from Star Counseling stating that appellant had received individual counseling session (appellant's exhibit YY).
It is well-settled that evidentiary rulings rest within the sound discretion of the trial court. Rigby v. Lake Cty. (1991),58 Ohio St.3d 269, 271. Thus, an appellate court will not interfere with the trial court's decision unless the court abused its discretion. Id.
To be admitted under Evid.R. 803(6) as a business record, the following must be satisfied:
 "`(i) the record was prepared by an employee of the business who had a duty to report the information; (ii) the person providing the information contained in the record had personal knowledge of the event or transaction reported; (iii) the record was prepared at or near the time of the event or transaction; and (iv) it was a regular practice or custom of the business in question to prepare and retain the type of record.'" McGraw v. Englehart (Dec. 22, 1995), Lake App. No. 94-L-105, unreported, 1995 WL 869962, at 4, quoting Cline v. Am. Aggregates Corp. (1989), 64 Ohio App.3d 503, 511-512. See, also, State Farm Fire Cas. Ins. Co. v. Kall (Mar. 31, 2000), Geauga App. No. 98-G-2203, unreported, 2000 WL 522524, at 9.[14]
 In the case at bar, it is clear that these documents are the precise items which are meant to be excluded by the hearsay concept. These documents are, as presented, inherently untrustworthy. There was no testimony provided that the exhibits were generated as part of a regularly conducted business activity, and/or that it was a regular practice to make such documents. In addition, no testimony was elicited as to where and how the documents were retained and maintained. These failures indicate that the requirements of Evid.R. 803(6) were not met. Hence, the juvenile court did not abuse its discretion in excluding the exhibits as evidence.[15] Appellant's fourth assignment of error is meritless.
Based on the foregoing analysis, appellant's four assignments of error lack merit, and the judgment of the juvenile court is, hereby, affirmed.
 ______________________________________ JUDITH A. CHRISTLEY, JUDGE
O'NEILL, P.J., concurs with Concurring Opinion, FORD, J., concurs.
[1] Appellant was also known by the name of Kelly Kozak.
[2] The case plan was subsequently amended as appellant completed the parenting class requirement.
[3] Appellant has four children: Joshua Michael Donnelly, twelve years old; Jacob Matthew Donnelly, nine years old; Veronica Donnelly, four years old; and Gabrielle, four years old. While appellant and her ex-husband have joint custody of Joshua and Jacob, the last time the children physically resided with appellant was in February 1994. Since then, they have resided primarily with their father. As for Veronica Donnelly, ACCSB obtained permanent custody of the child. However, on appeal to this court, we reversed the award of permanent custody to this agency on due process grounds because neither appellant nor her attorney were present at the permanency hearing. In re Donnelly (Mar. 31, 2000), Ashtabula App. No. 98-A-0054, unreported, 2000 WL 522484, at 4-5.
[4] Because the purpose of this hearing was to provide appellant with the opportunity to provide supplemental evidence, her motion to reopen the hearing was, in essence, granted.
[5] The child's father, John Evancic, has not made an appearance at any of the hearings and has not formed a relationship with Gabrielle.
[6] Because the agency was unable to perfect service upon appellant, the hearing was rescheduled for July 1999. This matter was again continued to October 8, 1999 upon request by appellant because she was unable to leave her employment and unable to afford transportation to Ohio.
[7] Appellant indicated that she had an accounting degree and was in the accounting field for twenty years.
[8] R.C. 2151.414(E)(4) reads as follows:
 "The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child[.]"
[9] The interstate compact placement request, which is codified in Ohio at R.C. 5103.20, states the following in Article III, section D:
 "The child shall not be sent, brought, or cause * * * to be sent or brought into the receiving state until the appropriate public authorities in the receiving state shall notify the sending agency, in writing, to the effect that the proposed placement does not appear to be contrary to the interests of the child." (Footnote omitted.)
[10] This is reflected in the juvenile court's January 13, 2000 judgment entry.
[11] While not raised as a cross appeal, we note that the interstate compact placement request form and the attached home study, arguably, could have been admitted under Evid.R. 803(8), the public record and report exception to the hearsay rule. Ranker at 11.
[12] Eventually, the December 18, 2000 hearing was rescheduled for January 11, 2001, pursuant to a request of appellant because she did not become aware that the court denied the continuance until December 14, 2000, and she was unable to obtain airplane reservations.
[13] We note that the juvenile court gave appellant a very brief opportunity to testify at the January 11, 2001 hearing and also to present Ms. Kozak as a witness.
[14] Evid.R. 803(6) reads as follows:
 "A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or as provided by Rule 901(B)(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term `business' as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit."
[15] With respect to appellant's exhibit UU, Amorette Strickland of ATI stated in her affidavit that the drug test records attached herein: (1) "were all prepared in the usual course of business of the facility[;]" (2) "were all prepared at or about the time of the events and the conditions they record[;]" and (3) "were prepared and maintained by employees of the facility[.]" However, the affidavit failed to specify whether the person preparing the records or contributing the information to the records had personal knowledge of the facts reported, or that it was a regular practice of ATI to make these records.